| | |
|---|---|
| **BUNCOMBE COUNTY, NORTH CAROLINA and CITY OF ASHEVILLE, NORTH CAROLINA, on their own behalf and on behalf of all others similarly situated,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**HCA HEALTHCARE, INC., HCA MANAGEMENT SERVICES, LP, HCA, INC**., **MH MASTER HOLDINGS, LLLP**, **MH HOSPITAL MANAGER, LLC**, **MH MISSION HOSPITAL, LLLP, ANC HEALTHCARE, INC. f/k/a MISSION HEALTH SYSTEM, INC., and MISSION HOSPITAL, INC.,**<br><br>  **Defendants**. | **No.: 1:22-cv-147**<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Buncombe County, North Carolina ("Buncombe") and City of Asheville, North Carolina ("Asheville") ("Asheville," and "Buncombe" together, "Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against Defendants HCA Healthcare, Inc., HCA Management Services, LP, and HCA, Inc. (collectively "HCA"), and MH Master Holdings, LLLP, MH Hospital Manager, LLC, MH Mission Hospital, LLLP, ANC Healthcare, Inc. f/k/a Mission Health System, Inc, and Mission Hospital, Inc. (collectively, "Mission") ("Mission" and "HCA" together, "Defendants"). Plaintiffs allege as follows:

# I.    NATURE OF THE ACTION

1.    This case arises at a time when providing affordable health care insurance plans for working families and governmental employees, such as firefighters, police, and teachers, and controlling health care costs have been top priorities for Plaintiffs and members of the proposed Class, the business communities they serve, and state and local governments in Western North Carolina. As described in detail in this Complaint, Defendants' conduct has restricted competition in the health care markets defined herein, thereby substantially and artificially inflating health care prices paid by Plaintiffs and proposed Class member health plans. This proposed class action for unlawful restraint of trade and monopolization seeks to redress these harms. Plaintiffs seek damages and injunctive and equitable relief under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

2.    Plaintiffs are a North Carolina county (Buncombe) and a North Carolina municipality (Asheville) which operate self-funded health insurance plans for their employees and their families. Plaintiffs directly pay one or more Defendant(s) for health care for their insureds and have been and continue to be injured thereby because Defendants' prices are artificially inflated due to the ongoing anticompetitive conduct alleged herein.

3.    Plaintiffs seek to represent a class of similarly situated North Carolina health insurance plans, including self-funded and commercial insurers ("health plans" or the "Class," which is more specifically defined in paragraph 190 below), each of which paid directly to one or more Defendant(s) on behalf of their insureds for health care services in the relevant markets alleged herein.

4.    Defendants have injured Plaintiffs and members of the Class through an anticompetitive scheme (the "Scheme") involving the illegal maintenance and enhancement of

2

monopoly power in two health care services markets (the "Relevant Services Markets"): (1) the market for inpatient general acute care ("GAC") in hospitals ("GAC Market"), consisting of a broad group of medical and surgical diagnostic and treatment services that include overnight hospital stays ("GAC Services"); and (2) the market for outpatient care ("Outpatient Market"), encompassing all the medical services that are not GAC Services ("Outpatient Services").

5.      Defendants dominate the Relevant Services Markets in at least two geographic areas (the "Relevant Geographic Markets"): (1) the "Asheville Region," consisting of Buncombe and Madison Counties; and (2) the "Outlying Region," consisting of Macon, McDowell, Mitchell, Transylvania, and Yancey Counties, or in the alternative with respect to Outlying Region, (3) each of the separate counties in the Outlying Region. Together, the Relevant Services Markets and the Relevant Geographic Markets are, collectively, the "Relevant Markets."

6.      In 1995 Mission Health System merged with St. Joseph's Hospital, Mission's only significant competitor in the Relevant Geographic Markets. As a result, Mission's flagship Asheville hospital ("Mission Hospital-Asheville") became the dominant provider of GAC Services in the Asheville Region with substantial monopoly power in the GAC Market in that region.

7.      From 1995 until 2016, Mission was immunized from antitrust liability by a state statute under which it was issued a Certificate of Public Advantage ("COPA"). The COPA is a form of regulation in which a hospital is permitted to operate with monopoly power in exchange for subjecting itself to state oversight.

8.      In 2016, after years of lobbying at the behest of Mission executives, the State repealed the COPA, leaving in place an unregulated organization with monopoly power. After

repeal, Mission and HCA Healthcare, Inc. (the parent company of the subsequent purchaser of Mission's assets) lost any immunity from suit under the Sherman Act.[1]

9.       In January 2019, Mission sold its assets to MH Master Holdings, LLLP, an HCA subsidiary and part of one of the world's largest for-profit hospital chains. HCA owns over 200 hospitals across the United States. HCA has been the subject of approximately twenty Federal Trade Commission ("FTC") antitrust proceedings over the past two decades. HCA purchased Mission's assets, in significant part, because Mission had monopoly power in the GAC Market in the Asheville Region—monopoly power that HCA knew it could exploit to maintain and enhance Mission's monopoly power in the Relevant Markets.

10.      Today, HCA controls more than 85 percent of the GAC Market, based on patient volume,[2] in the Asheville Region with an 89.1% share in Madison County and an 88.6% share in Buncombe County. The commercial insurers and self-funded payors (collectively, "health plans") that comprise the proposed Class, at all times relevant to this Complaint, had no choice but to include Mission's hospital system in the GAC Market in their insurance networks. There is no practical alternative for these services in this region.

11.      Due to the conduct challenged in this Complaint, HCA also enjoys monopoly power in the GAC Market in the Outlying Region, with a 70-plus% market share in each county in the Outlying Region: Yancey (88.3% market share); Mitchell (85.4% market share); Transylvania (78.7% market share); McDowell (76.4% market share); and Macon (74.7% market share).

---

[1] Hereinafter, unless otherwise indicated, "HCA" refers to the parent company that bought Mission and that parent's subsidiaries, while the term "Defendants" refers to HCA and the remnant companies of the former Mission.

[2] These market shares and all others reported in the Complaint are based on patient volume unless otherwise indicated.

12.     One of the reasons HCA found Mission attractive as a business opportunity is that, beginning in or about 2017, Mission, under its immediate pre-buyout executive management team, had embarked on a continuing, multifaceted coercive Scheme designed to foreclose competition from rivals, to maintain or to enhance its monopoly power in the Relevant Markets, and ultimately to charge supracompetitive prices—prices above their competitive level—for GAC and Outpatient Services. The anticompetitive conduct challenged in this Complaint began before HCA's acquisition of Mission, and HCA supercharged the Scheme after it acquired Mission. The Scheme includes, among other anticompetitive features: (1) "all-or-nothing" tying arrangements requiring health insurance plans to contract with all of Mission's (and later HCA's) GAC and Outpatient Services as a bundle, *i.e.*, take everything together or nothing at all; (2) exclusionary requirements in the form of anti-steering and anti-tiering provisions, which prevent insurance companies from steering insureds to less expensive and/or higher quality options as a means to promote competition and reduce prices; (3) "gag" clauses that prevent insurers from communicating with employers and patients about the prices they pay for health care and thus determine how best to reduce costs; and (4) other anticompetitive conduct relating to the negotiation of pricing for GAC Services. HCA continued and reinforced each of the foregoing elements of the Scheme after it acquired Mission in January 2019.

13.     Mission, and then HCA after purchasing Mission, have abused their monopoly power in GAC Market in the Asheville Region (the "tying market") to maintain or enhance their monopoly power in multiple "tied" markets, including the Outpatient Market in the Asheville Region, and the GAC Market and Outpatient Market in the Outlying Region (or, alternatively, in the five individual counties that make up that region). The Defendants have accomplished this, in part, by tying GAC and Outpatient Services together, in both the Asheville Region and Outlying

Region, and giving all health plans no choice but to include all of Defendants' services together as "in network" services.

14.     As explained below, when health services are "out of network" for a health plan, they typically will be much more costly to patients than if included "in network." By tying their services and regions together, Defendants coercively rob health plans of the ability to choose which service and providers are in or out of network. At the heart of the Scheme is this immutable fact: because of Mission's monopoly power, health plans require in-network access to HCA's GAC Services in the Asheville Region in order to offer any minimally viable health plan in the Relevant Geographic Markets. But because HCA ties access to that (tying) product to the other (tied) products and regions, HCA can coerce and has coerced health plans to contract for HCA's tied services. This tying prevents health plans from using the presence of actual or potential competing services in the tied markets as leverage to negotiate lower prices from HCA. Additionally, this coercive tying reinforces HCA's monopoly power in the tying market because it substantially reduces the ability of actual or potential competitors in the tying market to compete against HCA's all-or-nothing bundle. The tying thus enables HCA to discourage the sort of competition that lowers prices and improves quality. As a result, the Scheme has enabled HCA to continue to charge higher prices and to offer lower quality for its services in both the tying and tied markets as compared to a more competitive state of affairs in which HCA did not engage in the anticompetitive Scheme.

15.     In addition, and also as part of the Scheme, Mission and HCA have abused their monopoly power in GAC Market in the Asheville Region to impose exclusionary requirements in the form of coercively imposed anti-steering provisions in their contracts with health plans for both GAC and Outpatient Services in all Relevant Geographic Markets. These anti-steering

provisions prevent health plans from providing information or from encouraging patient use of less expensive and higher quality non-Defendant providers of GAC and Outpatient Services in the Relevant Geographic Markets. As a result, and together with the other conduct challenged in this Complaint, these anti-steering provisions prevent health plans from encouraging price competition between Mission/HCA and actual and potential rivals, and also reduce the incentive for rivals and potential rivals to use lower prices as a means to gain patients in all of the Relevant Markets (including both product and geographic markets).

16. Mission and HCA have further abused their monopoly power in the GAC Market in the Asheville region by imposing exclusionary requirements in the form of tiering prohibitions. Tiered networks, a form of steering, enable health plans to sort providers into tiers based on their cost and, often, quality relative to other similar providers who treat comparable patients. Health plans with tiering provisions give preferred rankings to providers with higher quality and lower cost, incentivizing members to use providers in the higher tiers. Tiering is an important means by which the plans help control their costs and reduce health care prices. Like its use of anti-steering provisions, its imposition of anti-tiering provisions forecloses competition and otherwise impedes beneficial competitive outcomes.

17. Defendants also have abused their monopoly power in the GAC Market in the Asheville Region to impose "gag" clauses that inhibit the ability of employer self-funded health plans to know the prices they pay for their employees' health care and use that information to help reduce health care costs.

18. By preventing health plans that must offer access to HCA's GAC Services in the Asheville Region from contracting with, or steering patients to, HCA's actual or potential competitors in the Relevant Markets, Defendants' Scheme substantially forecloses competition in

all of the Relevant Markets. The abilities to (a) assemble different combinations of in-network providers, including a mix of HCA and non-HCA providers, and/or (b) use incentives to steer patients to less expensive or higher quality alternatives, are essential methods that health plans use to promote competition among health care providers and thus control health care costs and ultimately prices to health plans. By substantially foreclosing these avenues of promoting competition, HCA has maintained and bolstered its monopoly power in the Relevant Markets, causing anticompetitive effects including higher health care prices and lower quality health care.

19. There are no legitimate procompetitive benefits for HCA's Scheme let alone benefits that could offset the competitive harms caused by the Scheme.

20. HCA itself has recognized the negative effects that unregulated hospital monopolies inflict on our nation's health care system. Indeed, in 2018—while it was negotiating its takeover of Mission—HCA complained to the Florida Agency for Health Care Administration about a competitor's "monopolistic dominance," stating that "patients suffer from lack of access to care in their community" and "have little to no health care provider choice," and "[t]his type of monopolistic environment within the health care market stifles innovation and breeds a culture that negatively impacts the cost and quality of care."

21. Defendants' Scheme has had clear and continuing anticompetitive effects. It has enabled Defendants to raise prices substantially above competitive levels, to reduce health care choices, to reduce quality through dramatically worsened facility conditions and patient service, and to reduce patient access to GAC and Outpatient Services in the Relevant Markets. Relatedly, HCA has refused to comply with a federal rule implemented by the Department of Health and Human Services in January 2021 that was intended to increase transparency in health care pricing.[3]

---

[3] https://www.cms.gov/hospital-price-transparency/hospitals.

Were HCA to comply and reveal to consumers and regulators the true prices that it charges, the public would know that HCA's prices in the Relevant Markets are by far the highest in North Carolina.

22.     The Scheme has caused antitrust injury to Plaintiffs and the proposed Class of similarly situated health plans, each of whom has paid supracompetitive prices for lower quality services in the Relevant Markets.

23.     Without this Court's intervention, the future of health care competition in Western North Carolina—traditionally a destination for many, including retirees from across the nation, in part because of its prior reputation for high-quality, low-cost health care—is at risk. Plaintiffs and the proposed Class have been and continue to be injured by the artificially inflated supracompetitive prices due to Defendants' Scheme and Plaintiffs bring this action for damages and equitable relief to enjoin the continuation of HCA's unlawful conduct.

## II.     THE PARTIES

### A.     Plaintiffs

24.     Plaintiff **Buncombe County** ("Buncombe") is a county in Western North Carolina, with a population of 269,452 as of the 2020 Census. Out of 100 counties in North Carolina, it is the seventh largest county by population. Included within Buncombe are parts of the Blue Ridge Parkway, Pisgah National Forest, and Nantahala National Forest. Buncombe has had for over 30 years, and continues to have, a self-funded health plan for its employees and their families. The plan covers 1,416 active Buncombe employees and over 3,700 people total, including employees' families and retirees. Buncombe has paid artificially inflated prices directly to one or more Defendants for GAC and Outpatient Services in the Asheville and Outlying Region markets due

to Defendants' unlawful conduct challenged herein. The Buncombe County Board of Commissioners has duly authorized this lawsuit to be brought in Buncombe's name.

25. Plaintiff **City of Asheville** ("Asheville") is a city in Buncombe County, North Carolina, with a population of 94,589 as of the 2020 Census. It is the county seat of Buncombe County. Asheville is the eleventh most populous city in North Carolina out of 532 incorporated municipalities. Asheville has had for over 10 years, and continues to have, a self-funded health plan for its employees and their families. The plan covers 1,122 active Asheville employees. Asheville has paid artificially inflated prices directly to one or more Defendants for GAC and Outpatient Services in the Asheville and Outlying Region markets due to Defendants' unlawful conduct challenged herein. The Asheville City Council has duly authorized this lawsuit to be brought in Asheville's name.

## B. Defendants

26. Defendant **HCA Healthcare, Inc.** is a Delaware corporation with a principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville TN 37203, and its registered agent, The Corporation Trust Company, is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

27. Through its subsidiary, MH Master Holdings, LLLP, HCA Healthcare, Inc. purchased the assets of Mission in 2019.

28. HCA Healthcare, Inc. is publicly held and listed with the Securities and Exchange Commission ("SEC"). HCA Healthcare, Inc. or its predecessors in interest have been named as respondents in prior antitrust proceedings brought by the FTC and/or the U.S. Department of Justice ("DOJ"), including with regard to hospital acquisitions and divestments of improper mergers.

29.     HCA Healthcare, Inc. is a defendant in a class-action lawsuit filed in the Superior Court of North Carolina, Buncombe County, on August 10, 2021, brought by a proposed class of insured residents in Western North Carolina, alleging similar conduct to that alleged herein, and claiming artificially inflated out-of-pocket costs and health insurance premiums for GAC and outpatient services. *See Davis, et al. v. HCA Healthcare, Inc., et al*., No. 21-CV-03276 (N.C. Super. Ct.). The proposed Class of health plans here does not include class members from the *Davis* lawsuit.

30.     HCA Healthcare, Inc. is the world's largest for-profit hospital chain. It owns and operates over 200 hospitals in 21 states. HCA's revenues were over $51 billion for 2020.[4] Its net income was over $3.7 billion in 2020.

31.     Defendant **HCA Management Services, LP** is a Delaware limited partnership with its principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville TN 37203, and its North Carolina registered agent, CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh, NC 27601.

32.     HCA Management Services, LP was formed in 1999. It applied for a certificate of authority to do business in North Carolina on December 28, 2005 and is currently registered to do business in North Carolina. It is listed on the HCA Healthcare website as the entity responsible for that website.[5]

33.     HCA Management Services, LP entered into a confidentiality and nondisclosure agreement with ANC Healthcare, Inc. f/k/a Mission Health System, Inc. on or about July 11, 2017.

---

[4] By comparison, according to the National Association of State Budget Officers, North Carolina's total expenditures in fiscal year (FY) 2020 were $60.2 billion, including general funds, other state funds, bonds, and federal funds. HCA Healthcare is number 62 on the Fortune 500.

[5] https://hcahealthcare.com.

At that time, MH Master Holdings, LLLP which was only first organized on August 23, 2018, did not yet exist. Pursuant to negotiations conducted under that nondisclosure agreement, various Mission and HCA entities entered into an Asset Purchase Agreement ("APA"), dated August 2018, and an amended Asset Purchase Agreement ("Amended APA"), dated January 2019, facilitating the sale of relevant Mission system assets to HCA.

34.     Defendant **HCA, Inc.** is a Delaware corporation with its principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville TN 37203.

35.     HCA, Inc. is the plan sponsor of a defined contribution plan established January 1, 1983, which provides retirement benefits for all eligible employees of HCA, Inc. or its affiliates (and their families). It is the sponsor of the HCA 401(k) Plan, with employer identification number 75-2497104, and a total number of participants of 387,421 as of 2019. On information and belief, HCA, Inc. is the plan sponsor of a retirement benefit plan for numerous employees associated with the North Carolina Division of HCA Healthcare, Inc. HCA, Inc. has been a respondent or defendant in prior proceedings challenging various aspects of HCA's business practices.[6]

36.     Defendant **MH Master Holdings, LLLP** applied for a certificate of authority to do business in North Carolina on August 23, 2018. It filed its most recent annual report with the North Carolina Secretary of State, Department of Corporations, on or about April 6, 2021, describing itself as being engaged in the "healthcare related business."

37.     MH Master Holdings, LLLP's general partner is MH Hospital Manager LLC. MH Master Holdings, LLLP is a 99% limited partner in MH Mission Hospital, LLLP. Under the

---

[6]     *See, e.g.,* U.S. DOJ press release, dated June 26, 2003. (https://www.justice.gov/archive/opa/pr/2003/June/03_civ_386.htm).

Amended APA, MH Master Holdings, LLLP is authorized to do business under brand names including "Mission Health," "Mission Health System," and the "HCA" brand.

38.     The "corporate bio" used at the end of many HCA NC press releases, opens, under the header "ABOUT MISSION HEALTH," by stating that "Mission Health [is] an operating division of HCA Healthcare [and] is based in Asheville, North Carolina…."

39.     Defendant MH Master Holdings, LLLP identifies itself as and holds itself out as being a part of the North Carolina Division of HCA Healthcare, Inc. *See, e.g*., job postings on websites like "Health Careers," listing open positions at "HCA Healthcare—North Carolina Division."

40.     HCA states in public website content that its "North Carolina Division," also known as, "Mission Health," is "based in Asheville, North Carolina."

41.     Per HCA press releases, since February 2019, Greg Lowe has been "president of the newly created Asheville-based North Carolina Division, which comprises the recently purchased Mission Health system of six hospitals in western North Carolina." Upon information and belief, Mr. Lowe resides in North Carolina.

42.     Defendant **MH Hospital Manager, LLC** is a Delaware limited liability company with a principal place of business in Tennessee or North Carolina. Its registered agent, c/o CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh NC 27615, or, at its office at 509 Biltmore Avenue, Asheville, NC 28801, or c/o HCA Healthcare, One Park Plaza, Nashville, TN 37203.

43.     Defendant MH Hospital Manager, LLC applied for a certificate of authority to do business in North Carolina on August 22, 2018. Its annual report dated April 6, 2021, describes the nature of its business as "healthcare related business."

44.     Defendant MH Hospital Manager uses the assumed business name, "North Carolina Division," pursuant to an assumed name certificate dated April 22, 2019, filed with the Buncombe County Register of Deeds. It described the counties where the assumed business name will be used to engage in business as "All 100 North Carolina counties."

45.     Defendant **MH Mission Hospital, LLLP** is a Delaware limited liability limited partnership, with a principal place of business in North Carolina. Its registered agent's office address, c/o CT Corporation System, is 160 Mine Lake Court, Suite 200, Raleigh, NC 27615, and its principal office is located at 509 Biltmore Avenue, Asheville, NC 28801.

46.     Effective July 2019, Chad Patrick became the Chief Executive Officer of what HCA describes as "HCA Healthcare's North Carolina Division's flagship 763-bed Mission Hospital" and has resided in Asheville since Summer 2019. On information and belief, the HCA corporate entity employing Mr. Patrick is MH Mission Hospital, LLLP.

47.     Defendant **ANC Healthcare, Inc. f/k/a Mission Health System, Inc.** is a North Carolina nonprofit corporation which had its principal place of business in Asheville, North Carolina through 2019. It remains an active corporation incorporated under North Carolina law. In or about February 2019, its principal office was moved to Florida. Its registered agent, Corporation Service Company, is located at 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608. Its current office address is 425 West New England Avenue, Suite 300, Winter Park, FL 32789.

48.     ANC Healthcare, Inc. f/k/a Mission Health System, Inc. was incorporated in 1981 as a North Carolina nonprofit corporation. As of the date of the filing of this lawsuit, it remains a nonprofit corporation incorporated under North Carolina law. *See* Articles of Restatement for

Nonprofit Corporation filed February 1, 2019. The corporation is not defunct, nor has it been dissolved and in its most recent Articles of Restatement it describes its duration as "unlimited."

49. As of 2015, ANC Healthcare, Inc. described itself as an "integrated healthcare system," which provided "medical care, hospital care" and "the delivery of health care services to persons resident in Western North Carolina and surrounding areas."

50. During the period commencing in or about 2010 and continuing through and including January 2019, Ronald Paulus ("Paulus") was the President and Chief Executive Officer of ANC Healthcare, Inc. f/k/a Mission Health System, Inc.

51. Defendant **Mission Hospital, Inc.** is a North Carolina nonprofit corporation, which had its principal place of business in Asheville, North Carolina for many years through 2019. It remains an active nonprofit corporation incorporated under North Carolina law. In or about February 2019, its principal office was moved to Florida. Its registered agent, Corporation Service Company, is located at 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608. Its current office address is 425 West New England Avenue, Suite 300, Winter Park, FL 32789.

52. Defendant Mission Hospital, Inc. was incorporated in 1951 as a North Carolina nonprofit corporation. As of the date of the filing of this lawsuit, it remains a nonprofit corporation incorporated under North Carolina law. *See* Articles of Restatement for Nonprofit Corporation filed February 1, 2019. The corporation is not defunct, nor has it been dissolved and in its most recent Articles of Restatement it describes its duration as "unlimited."

53. Defendants ANC Healthcare, Inc. f/k/a Mission Health System, Inc. and Mission Hospital, Inc. are each identified as sellers under the Amended APA. *See* Amended APA, p. 1. Under the Amended APA's terms, ANC Healthcare, Inc. f/k/a Mission Health System, Inc. and Mission Hospital, Inc. remain liable for pre-asset sale ownership or operations of the hospital

business. *See* Amended APA, § 2.4 (in which the HCA entities who function as the buyers under the Amended APA purported to exclude from their liability "any Liabilities related to the ownership or operation of the Business or the Purchased Assets prior to the Effective Time").

54.     Under the Amended APA, the sellers represented and warranted that they "have operated, and are operating, the Business… and their properties in compliance in all material respects with all applicable Laws," up through the sale date. Amended APA, § 4.11(a)(i). However, they did not comply with numerous such laws, as alleged herein.

## III.     JURISDICTION AND VENUE

55.     This Court has jurisdiction over this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15c & 26; and under 28 U.S.C. §§ 1331 and 1337.

56.     This Court has personal jurisdiction over Defendants because they are domiciled and/or registered to transact business in North Carolina, and they have transacted business in North Carolina relevant to this antitrust action.

57.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391. Defendants conduct substantial business in this district and their conduct both gives rise to Plaintiffs' claims occurring in this district and also affected interstate commerce.

## IV.     RELEVANT HISTORICAL BACKGROUND

### A.     Mission Acquired Monopoly Power Under the COPA

58.     Mission Hospital was originally formed over a century ago as a local Asheville charitable institution. When founded in the 1880s, the Dogwood Mission, also known as the Flower Mission, provided charity care to Asheville's sick and poor.

59. After World War II, Mission Hospital joined with other Buncombe County hospitals to become a major medical center in Western North Carolina. In 1951, Mission Hospital was incorporated as a nonprofit. Although it was a nonprofit, it was not under the patronage or the control of the State of North Carolina, nor was it a local health authority.

60. As of the early 1990s, the only two private acute care hospitals in Asheville were Mission Hospital-Asheville and St. Joseph's Hospital. Mission had 381 beds. St. Joseph's Hospital had 285 beds. The two hospitals sought to partner and lobbied the General Assembly to enact an initial version of the COPA law to facilitate a partnership in 1993.[7]

61. The two hospitals claimed that their plans did not call for a merger and that each hospital would maintain its distinct corporate identity, governance structure, and assets. Nonetheless, in 1994 the FTC opened a merger investigation out of a concern that the combination of St. Joseph's and Mission would result in a single large hospital dominating upwards of 80% or 90% of the market for GAC Services in Asheville.

62. In response, the hospitals lobbied the North Carolina General Assembly to amend the COPA to further immunize them from antitrust scrutiny.[8] The General Assembly did so in December 1995, and Mission and St. Joseph's then entered into their proposed partnership.

63. Subsequently, in 1998, Mission sought to buy St. Joseph's outright, acquire all of its assets, and combine operations under one license as Mission Health System. The COPA was amended in October 1998 to facilitate the merger.

64. The purpose of the COPA statute, as amended in 1998, was to strike a deal: in exchange for the State to allow the combination of Mission and St. Joseph's, which would be

---

[7] Hospital Cooperation Act of 1993, Session Law 1993-529.

[8] *See* N.C.G.S. §§ 131E-192.1 through 131E-192.13 (repealed).

exempt from antitrust laws, Mission would accept price regulation designed to prevent it from charging monopoly prices or otherwise abusing its market power by agreeing to "limit health care costs" and "control prices of health care services."[9]

65. The 1998 amended COPA law acknowledged that conduct that might be lawful under the COPA would be unlawful without it, noting that "federal and State antitrust laws may prohibit or discourage" the "cooperative arrangements" that the COPA allowed.[10]

66. When the COPA was amended in 1998 to allow the Mission-St. Joseph's merger, the State accepted the hospitals' representations that the merger "will not likely have an adverse effect on costs or prices of health care."[11]

67. The 1998 amended COPA documented the dominant market share of the merged Mission institution: "The two Hospitals dominate the market share in two counties. 91% of Madison County admissions and 87% of Buncombe County admissions are either Memorial Mission or St. Joseph's Hospital. Memorial Mission and St. Joseph's are located in Buncombe County. Madison County, which has no hospital, is closer to the two Asheville hospitals than to any other acute care hospital."[12]

68. A second amended COPA dated June 2005 stated: "Mission Health dominates the market share in two counties. 93.8% of Madison County admissions and 90.6% of Buncombe County admissions are at Mission Hospitals' facilities, which are located in Buncombe County.

---

[9] See former N.C.G.S. §§ 90-21.24, 90-21.28 (enacted by Physician Cooperation Act of 1995, SL 1995-395 (1995)); recodified at N.C.G.S. §§ 131E-192.1 through 131E-192.13 (repealed by Session Laws 2015-288, s. 4, as amended by Session Laws 2016-94, s. 12G.4(a), effective Sept. 30, 2016).

[10] See former N.C.G.S. §§ 90-21.24(5).

[11] 1998 COPA, p. 13; see also id., p. 14 (reciting that merger will "not likely have an adverse impact on … price of health care services").

[12] Id., pp. 7-8.

Madison County, which has no hospital, is closer to Mission Hospitals in Asheville than to any other acute care hospital."

69. A 2011 report by economist Greg Vistnes ("Vistnes Report") commissioned to study the efficacy of the COPA confirmed that a potential for regulatory evasion existed and that the COPA created an incentive for Mission to acquire facilities outside of Asheville because, while the COPA limited Mission's ability to raise prices and margins, the price increase cap was tied *only* to Mission Hospital-Asheville. This limitation meant that if Mission increased prices by acquiring facilities outside Asheville, then it could raise prices in theory, and did in practice, without technically violating the COPA's margin cap. Evidence presented at an FTC workshop in 2019 indicated that, in fact, Mission appeared to have evaded the restrictions of the COPA on price increases in precisely this way.

70. As of 2016, Mission continued to have a 93% share of the GAC Market in the Asheville Region. This dominant market share, which reflects Mission's acquisition of five smaller hospitals in these countries between 1995 and 2016, conferred upon Mission monopoly power. HCA has itself conceded in public statements about another health care system in Florida that an 85% share is sufficient to confer monopoly power.

71. In late 2015, the North Carolina General Assembly repealed COPA, effective January 1, 2018. After this date, the North Carolina government no longer exercised any direct regulatory authority over the prices that Mission could charge, even though Mission's monopoly power continued unabated.

**B.    HCA's Purchase of Mission's Assets**

72. In or around 2017, knowing that the COPA was soon to expire, Mission's executives entered into private, non-public negotiations to sell its assets to HCA, the nation's

largest hospital chain, via an HCA subsidiary as was subsequently documented in the APA.[13] The negotiation process was conducted without any public notice or input, despite HCA's and Mission's purported commitment to transparency and Mission's status as a charitable nonprofit with a fiduciary duty to the citizens of Western North Carolina. Non-executive doctors and staff were excluded from the negotiation process and the decision to sell to HCA.

73.     On March 21, 2018, Mission and HCA announced that HCA would be acquiring the assets of Mission. HCA pursued the Mission asset purchase primarily because of Mission's monopoly power in the GAC Market in the Asheville Region and the other Relevant Markets.

74.     On August 30, 2018, Mission and HCA executed an APA, which was amended in January 2019. The purchase price was approximately $1.5 billion. Mission's annual revenue at that time was estimated to be approximately $1.75 billion.

75.     Under terms of the asset transfer completed in January 2019, HCA and Mission formed the new North Carolina Division of HCA Healthcare.

## V.     HOSPITAL/INSURANCE MARKETS

### A.     Hospital/Insurer Negotiations in a Competitive Market

76.     Markets for hospital services are different from other product/services markets because the persons consuming the hospital services (the patients) do not typically negotiate—and in many cases, do not even know beforehand (or sometimes ever)—the costs of the services they are consuming. Instead, health plans—consisting of commercial payors (such as Blue Cross and Aetna) and self-funded payors whose claims are administered by insurers or third-party administrators (or "TPAs")—purchase medical services for the benefit of their members.

---

[13] https://www.searchwnc.org/asset-purchase-agreement.

77.     Health insurance plans negotiate with hospitals for bundles of services that they will offer to members as "in-network" benefits. If a health plan and heath care provider (like a hospital system) reach a deal for a bundle of services (for instance, all acute inpatient hospital services), the hospital will be considered in-network for every service in that bundle. This means that for any service in that bundle, if a health plan's member receives that service from the hospital, the health plan will pay the hospital the "allowed amount" the two parties negotiated for that service (with insureds responsible for any deductibles and co-payments under the health plans).

78.     In competitive health care markets, when health insurance plans negotiate for a bundle of services, the health insurance plans may choose to include as in-network only *some* services (or facilities) and to exclude others from the bundle. For example, the health insurance plan may choose to have one hospital be in-network for all GAC Services but choose not to include that hospital in-network for some Outpatient Services because the plan could purchase higher quality or less expensive Outpatient Services from other providers. Similarly, in a competitive market, a health insurance plan might decline to purchase any services from a hospital if that hospital's prices or quality of care are not competitive with other nearby providers. This ability to choose among different providers of services for a single health plan helps to control health care costs because it compels health care providers to compete with each other to be included in health plans.

79.     For a health insurance plan to be a viable product that consumers wish to purchase for themselves, or that employers wish to purchase or self-fund for their employees, the plan must include a comprehensive bundle of services that members can access in their geographic region. A health insurance plan will not be commercially viable or acceptable if it does not offer in-

network services or facilities that individuals commonly desire or that individuals may need to access in the case of unforeseen health problems.

80. In competitive markets, hospitals compete to be selected for inclusion in health plans. Likewise, health insurance plans compete to be selected by employers to offer to their workers or compete to be selected by individuals. Because of the unique way that health care services are purchased and consumed, this competition is essential for there to be services of acceptable quality at competitive prices and to control health care costs and prices. By short-circuiting this competition, the Scheme enabled HCA to exploit its monopoly power to bolster and to maintain that power and ultimately to charge supracompetitive prices for lower quality care.

**B. Hospital/Insurer Negotiations in the Absence of Competition**

81. The unique features of health care markets, as just described, provide an opportunity for health care providers with significant market power to restrain trade and bolster monopoly power illegally through unduly restrictive agreements with health plans that foreclose competition and thereby extract supracompetitive prices for health care services. As alleged above, supracompetitive prices are rates that are higher than what would be found in the context of normal competition. Normal competition can occur only where dominant hospitals do not unlawfully restrain trade and/or abuse monopoly power.

82. When a health insurer or self-funded plan seeks to offer a plan in a geographic region where a significant area is serviced by a single hospital that provides essential health care services, that hospital is essential for health plans to include in their networks, and is, in effect a "must have" hospital for that health plan. Individuals and employers seeking insurance will not choose any health plan that does not include necessary services provided by that hospital.

83. If a "must have" hospital decides to engage in anticompetitive behavior, it can cause significant financial harm to health plans, and to employers offering such plans. If the "must have" hospital is part of a system that has other facilities that *do* face at least some fringe competition or potential competition, the hospital system can leverage its monopoly power to refuse to offer medical services at the "must have" facility unless health plans also agree, *inter alia*, to (a) purchase medical services from the system's other facilities at artificially high prices dictated by the hospital system, and (b) impose restrictive terms that prevent health plans from steering patients to less expensive and/or higher quality alternative providers, which would in turn put pressure on those high prices.

84. "Must have" hospitals, by definition, therefore, leave health plans with no other effective choices and can and sometimes do use that status to perpetuate their dominance and the dominance of the other facilities in their systems. In this way, "must have" hospitals coerce health plans to accept terms the health plans otherwise would not agree to in a competitive environment, eliminating or impairing the ability of health plans to spur price competition between providers.

85. The foregoing factors and others have led to a consensus in the field of health care economics that monopolization of hospital markets significantly increases prices for hospital services paid by health plans, employers, and individuals, in the form of, *inter alia*, artificially inflated direct payments to hospitals from insurers and self-funded payors. The economic literature also demonstrates that there are no concomitant improvements in quality from such monopolization. To the contrary, medical providers with monopoly power exercise that power not only by charging higher prices, but by cutting corners, including by reducing locations where they operate, reducing staffing, and otherwise by allowing the quality of their services to deteriorate. HCA itself stated in a regulatory filing in Florida that "there is documented empirical evidence of

the negative aspects of lack of competition in a health care market on charges, costs, and quality of care" and "economic studies consistently demonstrate that a reduction in hospital competition leads to higher prices for hospital care."[14]

86.     Hospitals with monopoly power also use that power to erect artificial barriers to competing health care providers, as Defendants have done here in both the GAC and Outpatient Relevant Markets. They can, as Defendants have done here, compel health plans to accept: (a) "all or nothing" tying arrangements that require health plans to contract with all of the facilities and services offered by the organization owning "must have" hospitals with substantial market power; (b) exclusionary arrangements in the form of anti-steering and anti-tiering provisions that prevent or discourage health plans from informing and/or incentivizing their members to use other less expensive and/or higher quality providers of health care; and (c) "gag" clauses that prevent patients, other providers, other health plans, and existing or potential entrants, from knowing the prices that monopoly providers charge. Gag clauses effectively eliminate information about prices, which are the lifeblood of competitive markets, and thus inhibit the ability of purchasers of health care services to control health care costs.

87.     Taken together, the foregoing exclusionary contractual provisions imposed on health plans by hospital systems with monopoly power, like Defendants have utilized here, can and do foreclose competition, entrench that provider's monopoly power in its own "tying market" and in other "tied markets," and cause substantial anticompetitive effects across markets, including here, the Relevant Markets.

_____

[14] HCA (Medical Center of Southwest Florida LLC) Certificate of Need Application #10523, Florida Agency for Health Care Administration, April 11, 2018. ("HCA Certificate of Need Application").

## VI.    THE RELEVANT MARKETS

88.    Monopoly power may be proven by using direct evidence of the ability to (a) coerce buyers to accept unwanted contractual terms, or (b) charge supracompetitive prices, reduce quality, or reduced output. Monopoly power may, alternatively, be proven by demonstrating substantial market shares in a relevant or geographic market. Defendants have the ability to impose anticompetitive contract terms in its agreements with health plans covering a substantial share of those using health care services in the Relevant Geographic Markets, and thereby to (i) foreclose competition from actual and potential health care provider rivals, (ii) persistently charge supracompetitive prices, (iii) reduce output, and (iv) reduce quality of their services. The foregoing effects constitute direct evidence of Defendants' monopoly power over the health care services in question and in the regions at issue.

89.    Nonetheless, and in the alternative, the Relevant Markets at issue in this case are defined in detail below. For each, the service market includes only the purchase of medical services by private health plans, namely commercial insurance plans and employer self-funded payors. The service markets do not include sales of such services to government payers, including Medicare (and Medicare Advantage), Medicaid, and TRICARE (covering military families), because health care providers' negotiations with commercial insurers and employer self-funded plans are separate from the process used to determine the rates paid by government payers.

### A.    The Relevant Product/Service Markets

90.    As discussed above, there are two product or service markets that are relevant in this action. First, the GAC Market includes GAC Services, which consist of a broad group of medical, surgical, anesthesia, diagnostic, nursing, laboratory, radiology, dietary, and other treatment services provided in a hospital setting to patients requiring one or more overnight stays.

Because GAC Services are not substitutes from a patient's perspective for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), health insurance plans typically contract for various individual inpatient GAC Services as a package in a single negotiation with a hospital system and/or set of providers. That is precisely how Defendant HCA negotiates (and how Mission before it negotiated) with health plans with respect to GAC Services at Mission Hospital-Asheville. Non-hospital facilities, such as outpatient facilities, specialty facilities (such as nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services are not viable substitutes for acute inpatient hospital services.

91.     The second product or service market is the Outpatient Market, which encompasses a broad group of medical, diagnostic, and treatment services that are not inpatient medical services (*i.e.*, health care services that do not require an overnight stay). Although individual Outpatient Services are not substitutes for each other (*e.g.*, a CT scan is not a substitute for an annual physical), health plans typically contract for various individual outpatient medical services as a package in a single negotiation with a hospital, hospital system and/or set of providers, and that is how Defendant HCA negotiates (and how Mission before it negotiated) with health insurance plans with respect to Outpatient Services at Mission Hospital-Asheville.

92.     The Outpatient Market is a separate market from the GAC Market because the two types of services are not interchangeable and can be sold separately. Health insurance plans can, and often do, purchase Outpatient Services from different providers (*i.e.*, non-hospital providers), unlike the purchase of GAC Services, which can only be purchased from hospitals. The existence of non-hospital competitors, in a competitive market absent any anticompetitive behavior, reduces the price health insurance plans pay a hospital for Outpatient Services, but those non-hospital

outpatient competitors would not affect the price a hospital could charge for GAC Services. The GAC Market and Outpatient Markets are therefore distinct.

93.     The distinction between the two types of health care services—GAC and Outpatient—is also widely recognized in the academic and government regulatory literature on health care.

94.     Both relevant service markets at issue satisfy the conditions for market definition used by the federal antitrust enforcement agencies under what is widely known as the "SSNIP test." Each of these service markets constitutes a distinct group of services in which a hypothetical monopolist provider would profitably impose at least a small but significant non-transitory increase in price above competitive levels (*i.e.*, at least 5%).

95.     Defendant HCA provides GAC Services and Outpatient Services in each of the Relevant Geographic Markets alleged below.

### B.     The Relevant Geographic Markets

96.     There are at least two geographic markets that are relevant to this action. These market definitions reflect the fact that plan members, and thus plans, typically choose GAC hospital and Outpatient care within reasonable proximity to members' homes or workplaces. Each geographic market definition below meets the SSNIP test: each market is an area in which a hypothetical monopoly provider of GAC Services and/or Outpatient Services in each of the Relevant Geographic Markets would profitably raise its prices above competitive levels by at least a small but significant non-transitory amount (*i.e.*, at least 5%).

### 1. Asheville Region.

97.     Buncombe and Madison Counties (together the "Asheville Region") are one relevant geographic market. HCA participates in the Asheville Region Geographic Market predominately through its flagship facility, Mission Hospital-Asheville.

98.     The predecessor entity whose assets HCA purchased, Mission, defined its service area as consisting of Buncombe and Madison Counties, or the Asheville Region.[15]

99.     The 2020 Census reported the population of Buncombe County was 269,452 and the population of Madison County was 21,193.

100.     The 2010 Census reported the population of Buncombe County was 238,318 and the population of Madison County was 20,764.

101.     Given the broad scope of GAC Services offered in the Asheville Region and the extensive travel times required to obtain them elsewhere, there are no reasonable substitutes or alternatives to GAC Services in the Asheville Region for health plans and their members, who are persons living or working in that area. Consequently, competition from providers of GAC Services located outside the Asheville Region would not likely be sufficient to prevent a hypothetical monopolist provider of GAC Services in the Asheville Region from profitably imposing at least a small but significant price increases above competitive levels for those services over a sustained period of time.

---

[15] *E.g.*, Mission Hospital Implementation Strategy, 2013-15, p. 1 ("Our community, defined for the purposes of community health needs assessment and this related implementation strategy, is comprised of Buncombe and Madison Counties."), https://missionhealth.org/wp-content/uploads/2018/04/2013-Mission-Hospital-Implementation-Strategy.pdf. *See also* IRS Form 990 for period ending September 2019, Schedule H, supplemental information ("Mission Hospital primarily serves Buncombe and Madison Counties").

102. There are no reasonable substitutes or alternatives to Outpatient Services in the Asheville Region from Outpatient Services outside the Asheville Region for health plans and their members. People who live and work in the Asheville Region strongly prefer to obtain Outpatient Services in that area (indeed, it is often medically inappropriate to require them to travel farther). Consequently, competition from providers of Outpatient Services located outside the Asheville Region would not likely be sufficient to prevent a hypothetical monopolist provider of Outpatient Services located in the Asheville area from profitably imposing at least a small but significant price increases above competitive levels for those services over a sustained period of time.

### 2. Outlying Region.

103. A second relevant geographic market consists of the area encompassed by the following counties in or near where Defendant HCA's hospitals operate: Macon, McDowell, Mitchell, Transylvania, and Yancey Counties (collectively, the "Outlying Region"). In the alternative, each of these counties in the Outlying Region constitutes its own separate Relevant Geographic Market.

104. HCA has hospital facilities (the "Outlying Facilities") serving each the above-described geographic areas: Transylvania Regional Hospital, Transylvania County; Angel Medical Center, Macon County; Highlands-Cashiers Hospital, Macon County; Mission Hospital McDowell, McDowell County; and Blue Ridge Regional Hospital, Mitchell County.

105. HCA faces a fringe of some actual or potential competition for GAC Services and Outpatient Services in the Outlying Region from other hospitals and non-hospital providers. Thus, due to the somewhat heightened level of competition (as compared to Mission Hospital-Asheville), in the absence of Defendants' anticompetitive conduct, health plans seeking to build a viable

insurance network would not be required to include all Outlying Facilities in-network in order to be viable.

106. The Outlying Region constitutes a separate geographic market from the Asheville Region because GAC and Outpatient Services in the Outlying Region are not interchangeable with, and can be sold separately from, the GAC and Outpatient Services provided in the Asheville Region. These Relevant Geographic Markets involve different facilities, operating primarily in different geographic regions, and different types of service are offered in each. For instance, in the Asheville Region, Defendants offer acute trauma care, whereas this service is not offered by any of Defendants' facilities in the Outlying Region. Moreover, some of Defendants' facilities in the Outlying Region face some competition from other providers, which is more competition than Defendants' facility at Mission Hospital-Asheville faces, particularly for GAC Services.

107. In general, in competitive health care markets, health plans can and often do purchase Outpatient Services from different providers (*i.e.*, non-hospital providers), which distinguishes Outpatient Services from GAC Services, which can only be purchased from hospitals. The actual and potential competition that the facilities in the Outlying Region face (and would face) both from other hospitals and non-hospital facilities, in a competitive market absent any anticompetitive behavior, would reduce the prices health plans would pay the facilities in the Outlying Region for GAC and Outpatient Services.

108. In the alternative, each of the individual counties that make up the Outlying Region are separate geographic markets. In the alternative, the hospital facilities in each of these counties are sufficiently far apart from the hospital facilities in the other counties that no more than an insignificant number of patients would use the GAC and Outpatient Services outside the county in which they live or work.

## VII. DEFENDANTS' MONOPOLY POWER

109. Due to the Scheme, Defendants have maintained, acquired, and/or bolstered monopoly power in all Relevant Services and Geographic Markets.

110. HCA has a market share of approximately 80% to 90% in the GAC Market in the Asheville Region, primarily due to the dominance of Mission Hospital-Asheville. HCA acquired this market dominance when it bought the assets of Mission and maintains that dominance through the Scheme. This market dominance was reflected in the market shares of the Mission Hospital-Asheville in the top three zip codes, by population, in the Asheville Region for the calendar year ending December 31, 2019: 88.9% for zip code of residence 28806; 86.5% for zip code of residence 28803; and 87% for zip code of residence 28715.[16]

111. Defendants' market share in the GAC Market in the Asheville Region is significant enough to stifle competition and restrict freedom of commerce, and, at all times relevant to this Complaint, and due to the Scheme alleged herein that has helped Defendants maintain that monopoly power, Defendants have had the ability to inflate prices above competitive levels in this market.

112. Mission also had high shares of patients in the GAC Market in the Asheville Region, as well as in the other counties in the Outlying Region (*i.e.*, Macon, McDowell, Mitchell, Transylvania, and Yancey Counties). In a Certificate of Need ("CON") application dated June 15, 2022, HCA admitted that "Mission is the largest provider of acute care services to Buncombe, its home county, as well as Graham, Madison and Yancey Counties." More specifically, the most recent GAC market share data, by county, are as follows:

---

[16] *See* American Hospital Directory, available at https://www.ahd.com/free_profile/340002/Mission_Hospital_-_Memorial_Campus/Asheville/North_Carolina/.

- Yancey: 88.3%
- Madison: 89.1%
- Buncombe: 88.6%
- Mitchell: 85.4%
- Transylvania: 78.7%
- McDowell: 76.4%
- Macon: 74.7%

113.    Given the high entry barriers facing new hospitals, and also Defendants' Scheme alleged herein, these market shares have not been materially reduced, and have likely increased, since HCA bought Mission.

114.    Although the market share data are not publicly available for all Outpatient Services in all Relevant Geographic Markets, for ambulatory surgical services, Mission has approximately 79% of the Buncombe County market based on data obtained from hospital annual license renewal applications reflecting 2021 data aggregated from the six Mission hospitals, plus the hospitals owned by Advent, Haywood, UNC Blue Ridge, Pardee and Harris in the western North Carolina service area. Defendants control approximately 80% of the market for all Outpatient Services in Buncombe County. Likewise, for all Outpatient Services in other Relevant Geographic Markets, Defendants have the ability to charge supracompetitive prices, reduce output, and decrease the quality of service—indeed, while maintaining very high market shares—which they could not do unless they had monopoly power.

115.    For example, since HCA's acquisition of the Mission system, HCA has cut Outpatient Services in the Outlying Region, compelling patients to travel to HCA's Asheville facilities to obtain care. Outpatient clinics for primary, geriatric, and cancer care in the Outlying Region have been especially targeted for cuts. More specifics regarding HCA's reduction in quality are further alleged below.

116.    Likewise, as shown in more detail below, HCA's ability, like Mission's before it, to maintain prices for key medical services at levels and growth rates substantially above the statewide average for those procedures demonstrates HCA's monopoly power in all Relevant Markets.

## VIII.    DEFENDANTS' UNLAWFUL CONDUCT

### A.    HCA's Unlawful Scheme

117.    Defendants engaged in a multifaceted Scheme to gain, maintain, and bolster monopoly power in the Relevant Markets, substantially foreclose competition, and thereby impose supracompetitive prices on Plaintiffs and members of the proposed Class. Defendants use the Scheme to generate these anticompetitive effects by leveraging the monopoly power that HCA has in GAC Services in the Asheville Region to force health plans to accept terms that reduce payors' ability to promote competition by, *inter alia*, steering patients to lower priced, higher quality options.

118.    Defendants' Scheme involves a web of contracts that Defendants have imposed on insurers, which include, but are not limited to: (1) "all-or-nothing" offers that tie Defendants' must-have GAC Services in the Asheville Region to accepting GAC Services in the Outlying Region as a whole (or, in the alternative, in each of the five county markets in the Outlying Region), as well as to Outpatient Services in all Relevant Geographic Markets; (2) exclusionary arrangements in the form of anti-steering and anti-tiering contractual provisions that prevent or discourage patients from dealing with Defendants' rivals and potential rivals; and (3) "gag" clauses that prevent price transparency.

119.    Individually and in combination, the elements of the Scheme are designed to suppress competition and transparency in the Relevant Markets, foreclose competition, and

thereby to increase the prices Defendants charge for health care to Plaintiffs and the proposed Class above competitive levels.

120. Anticompetitive contractual provisions and negotiating tactics are particularly problematic when a provider controls "must have" services, as HCA does with GAC Services through Mission Hospital-Asheville. It is not practically possible to assemble a commercially viable insurance plan covering both GAC and Outpatient Services that excludes Mission Hospital-Asheville. In a market with a "must have" hospital, even the limited use of these contractual provisions or negotiating tactics causes much greater competitive harm than the use of such practices and provisions in a competitive market.

121. Certain of the anticompetitive contractual provisions and negotiating tactics at issue here have been the subject of judicial scrutiny in the Western District of North Carolina in *United States of America, et al. v. The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Health Care System*, No. 3:16-cv-00311-RJC-DCK, 2019 WL 2767005, 2019-1 Trade Cases P 80,752 (W.D.N.C. April 24, 2019), where the defendant health care system ultimately entered into a consent decree, approved by the court, not to enforce anti-steering provisions in its contracts with health plans.

122. HCA has a pattern and practice of using similar negotiating tactics and including similar unlawfully restrictive provisions in contracts with health plans to those alleged here in other parts of the United States, including but not limited to Colorado and Virginia. The kinds of contractual provisions or arrangements alleged here also have been found to be illegal even in markets with more robust provider competition than exists here, because they inherently harm consumer welfare and competition. However, because Defendants have monopoly power in all the

Relevant Markets, the impact on Plaintiffs and the proposed Class is much more severe than in those other markets.

### 1. HCA's "All or Nothing" Requirements.

123. HCA has used its monopoly power in the GAC Market in the Asheville Region, derived from its "must have" Mission Hospital-Asheville, to impose "all or nothing" contracts on health plans operating in all other Relevant Markets. Under these provisions, HCA coerces health plans to include all of HCA's GAC and Outpatient Services in the Outlying Region in the plans, as well as HCA's Outpatient Services in the Asheville Region. HCA significantly disadvantages health plans that do not commit to include in the health plan's top tier and promote all of the GAC and Outpatient Services provided by HCA facilities in the Relevant Geographic Markets.

124. These "all or nothing" contractual provisions constitute unlawful tying under the antitrust laws. Tying occurs when an entity that has market power in one market (the "tying market") leverages that market power in order to gain, maintain, or enhance monopoly power in another market or markets (the "tied market(s)"). Under such tying arrangements, the defendant will sell one service or set of services (the "tying service(s)") only under the condition that the purchaser buys a second service or set of services (the "tied service(s)"). Where the defendant has monopoly power in the tying market, and where the tie allows the defendant to gain, maintain, or enhance monopoly power in the tied market, such tying arrangements are considered anticompetitive and unlawful under the antitrust laws.

125. When a hospital system is the only entity in a given region to offer a product or service that health plans must include in their networks to be viable, that hospital system can refuse to sell services to health plans, or sell only with a significant price penalty, unless those health plans also agree to purchase other services from the hospital system, including services that the

health plan would otherwise purchase from a different hospital system or set of providers for lower prices. Either orally during negotiations or in the contracts themselves, a hospital system can give the health plan what effectively is an "all-or-nothing" choice: Include everything the hospital system wants to sell at the price the hospital system dictates or pay much higher penalty prices or even get nothing at all. That is what HCA has done here.

126.     In this case, the "tying market" is the GAC Market in the Asheville Region, enabled by HCA's (and prior to that, Mission's) monopoly power through Mission-Asheville Hospital. The "tied markets" include the Outpatient Market in the Asheville Region and both the GAC Market and Outpatient Market in the Outlying Region, or in the alternative, in each of the five counties that comprise the Outlying Region. As a result of the Scheme, HCA has monopoly power in all these markets, measured either by its dominant market shares and/or by its supracompetitive prices, which are inflated by Defendants' Scheme.

127.     Mission began forcing health insurance plans to accept "all or nothing" contractual provisions as early as 2017. For example, in 2017 during Mission's negotiations with Blue Cross, Mission asked for exorbitant price increases for GAC and Outpatient Services, and further insisted on the inclusion of services from HCA covering both inpatient and outpatient care in all Relevant Geographic Markets in the Blue Cross contract. When Blue Cross did not agree to Mission's "all or nothing" demand for all these services, Mission took itself out of the Blue Cross network for GAC and Outpatient Services in the Relevant Markets, including the "must have" Mission Hospital-Asheville. Mission's actions meant that the 260,000 people in Western North Carolina insured by Blue Cross could not seek care at Mission facilities unless they paid much higher "out of network" prices out of their own pockets.

128.    While hospital systems and insurers regularly negotiate over rates and terms, a hospital system taking an insurer out of network—especially where the hospital system has such monopoly power—is considered "go[ing] nuclear." With respect to the 2017 negotiation between Mission and Blue Cross, Mission's imposition of the "nuclear" option disrupted the administration of health care in the entire region, requiring tens of thousands of Blue Cross members to switch doctors, forgo medical care, or drive long distances to receive care at a non-Mission facility. Mission remained out of network for Blue Cross for two months, until Blue Cross capitulated, accepting both a rate increase and inclusion of the entirety of the Mission system in all Relevant Markets in network. Given that Blue Cross is the largest health plan in North Carolina and in the Relevant Markets, HCA's ability to bully Blue Cross into accepting its "all or nothing" (and other anticompetitive terms as part of the Scheme) leaves little room for doubt that HCA was also able to compel the other health plans comprising the Class to accept the same restrictive provisions.

### 2.    HCA's Anti-Steering and Anti-Tiering Provisions.

129.    HCA has also abused its monopoly power in the GAC Market in the Asheville Region to impose so-called anti-steering provisions on health plans operating in all Relevant Geographic Markets. Anti-steering provisions prohibit health plans from encouraging their members (through financial incentives or otherwise) to use other, less expensive and/or higher quality providers of GAC or Outpatient Services that compete or could compete with HCA's facilities. These contractual provisions discourage rivals from using price as a means of competition (because rivals cannot effectively use price to attract customers), and thus they lead to less competition, and higher market-wide prices. These anti-steering provisions are anticompetitive and constitute unlawful exclusionary conduct.

130.     To try to reduce costs and induce competition among health care providers, Health plans can incentivize their plan subscribers to use lower-cost facilities by including language in insurance plan documents encouraging subscribers to choose one facility rather than another or by conditioning the selection of a higher-cost facility on a higher copay or deductible from the subscriber.

131.     Because the individual choosing the health care service provider is not paying the full cost, and the payer—here, the health plan—is not choosing services at or before the point of care, steering is a critical means of ensuring competition for health care services and, thus, reducing health care prices, particularly in consolidated markets. Where steering is not barred, health care providers are incentivized to use price or quality as a means of encouraging plans to steer business their way. As such, plans' use of steering can foster healthy competition between providers and encourage the growth of new providers that have a means of breaking into a market and gaining sales if they can lower price and/or improve quality. Many of the most innovative healthcare plans in the country today are based on steering to more efficient providers.

132.     Hospital systems' attempts to impose anti-steering provisions, like those Mission and HCA have coerced health plans in Western North Carolina to accept as part of the Scheme, are anticompetitive because they block the ability of health plans to incentivize less expensive and higher quality options and thereby stymie competition and lead to higher prices and lower quality, especially as here, when employed in conjunction with other anticompetitive contractual provisions. In November 2018, the Assistant Attorney General in charge of the Antitrust Division of the DOJ chastised another North Carolina hospital system's "use of anticompetitive steering restrictions in its contracts with major health insurers," restrictions which "prevented health insurers from promoting innovative health plans and more cost-effective health care providers. . .

[and which] inhibited competition among health care providers to provide higher quality, lower-cost services."[17] Likewise, Senator Chuck Grassley, then chairman of the Senate Judiciary Committee said the anti-steering practices of HCA and several other systems were, "restrictive contracts deliberately designed to prevent consumers' access to quality, lower cost care."[18]

133.     Tiered networks allow health plans to sort providers into tiers based on their price and, often, quality relative to other similar providers who treat comparable patients. Health plans that have tiered networks assign providers with higher quality and lower prices to higher tiers. Health plans use tiering to incentivize members to use providers in the higher tiers and are an important means by which the plans help reduce prices for their members.

134.     At all times relevant to this Complaint, Defendants have limited health plans' ability to use steering or tiering, as a condition of those plans' obtaining access to Defendants' "must have" Mission Hospital-Asheville. Such limitations include, at a minimum, limits on insurers' ability even to provide information about less expensive providers that compete with HCA.

135.     Investigative reporting has shown that HCA has a history of using anti-steering, anti-tiering, or similarly restrictive contractual language in their contracts with health plans in other states and regions.

### 3.     HCA's Gag Clauses and Lack of Transparency.

136.     Defendants abused their monopoly power in the Relevant Markets to obscure their price increases and anticompetitive contracts from regulators and the public through use of gag

---

[17]         https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-remarks-american-bar-association-antitrust.

[18]     Cited in     https://www.law360.com/articles/1091446/grassley-seeks-ftc-probe-of-hospital-insurer-contracts.

clauses that prevent insurers from revealing their agreements' terms. Gag clause language is anticompetitive because it prevents competitors, insurers, and consumers from understanding in a transparent manner the pricing and other terms and arrangements being used by hospital systems, which in turn inhibits the ability of employers to control health care costs.

137.     Moreover, HCA has continued to refuse to release the prices it charges for its GAC and Outpatient Services in a fully transparent manner despite a recent change in federal law requiring it to do so. Effective January 1, 2021, a new federal regulation required the public disclosure of certain aspects of HCA's negotiated price terms in agreements with private insurance companies. *See* 45 C.F.R. § 180.50. HCA has however failed to fully disclose this information in a timely, complete, and understandable manner, in violation of federal law.

138.     By violating this price disclosure regulation, and by including gag clauses in HCA/Mission's provider agreements with insurers, Defendants have kept community members, regulators, and the general public from learning of the artificially inflated prices that are being charged.

139.     This rule was first created by the Trump Administration over the opposition of HCA's lobbying and then proactively continued by the Biden Administration—signaling growing bipartisan consensus that the lack of price transparency with regard to hospital services leads to higher prices for consumers and employers.

**B.     Defendants' Scheme Has Foreclosed Substantial Competition in Each of the Relevant Markets**

140.     As a direct and proximate result of Defendants' Scheme, Defendants have foreclosed a substantial share of competition in each of the Relevant Markets.

141.     By prohibiting health plans from "mixing and matching" different sets of providers, Defendants' all-or-nothing tying requirement anticompetitively and artificially impairs the ability

of actual or potential rival providers of the tied products and/or services to compete with HCA's products and/or services. Likewise, Defendants' tying impairs the ability of health plans to assemble networks of the highest quality, lowest cost providers to offer to employers.

142. Moreover, Defendants' anti-steering and anti-tiering provisions anticompetitively and artificially drive business away from less expensive and/or higher quality providers of GAC and Outpatient Services in all Relevant Geographic Markets, impairing the ability of actual or potential rival providers to compete or to use price or quality as a means of gaining patients and market share. Indeed, rival providers have no incentive to offer lower prices to health plans, because health plans cannot, because of Defendants' contracts, do anything to reward them with a higher patient volume.

143. Similarly, Defendants' gag clauses that prevent the dissemination of price information—essential to any well-functioning competitive market—impair the ability of rival providers both to attract business and for health plans to assemble the highest quality, lowest cost menu of in-network providers.

144. Defendants have used their dominance in inpatient GAC at Mission Hospital-Asheville to gain, maintain, and enhance monopoly power through their Scheme in GAC and Outpatient Services in all Relevant Geographic Markets. For example, through the Scheme, Defendants have shielded their smaller, regional hospitals, including Angel Medical Center and Highlands-Cashiers Hospital (Macon County), Blue Ridge Regional Hospital (Mitchell County), and Transylvania Regional Hospital (Transylvania County) from competition. In short, through their Scheme, Defendants have substantially foreclosed competition from rival hospitals in each of the Relevant Markets, keeping Defendants' rivals' market shares at levels that are too low to constrain Defendants' ability to raise prices above competitive levels.

145.    For example, HCA has an 85.3% market share in zip code 28712 in Brevard, NC, the top inpatient zip code for HCA's Transylvania Regional Hospital in Brevard, Transylvania County.[19] In contrast, Pardee UNC Hospital only holds 10.4% market share, despite being about half the driving distance from Brevard and substantially lower cost than Mission Hospital-Asheville. Due to its unlawful Scheme, HCA prevents health plans from steering patients to rival facilities and blocks the ability of rivals to gain share by cutting price and/or increasing quality. As a result, HCA's hospital maintains a far greater market share in Transylvania County than the Pardee UNC Hospital.

146.    Similarly, HCA has a 92.4% market share in zip code 28741 in Highlands, NC, the top inpatient zip code for HCA's Highlands-Cashiers Hospital in Highlands, NC, located in Macon County.[20] Northeast Georgia Medical Center only holds 7.6% market share, despite being closer driving distance from Highlands and substantially lower cost than Mission Hospital-Asheville. HCA has used its Scheme to maintain and entrench its monopoly power in GAC Services in Macon County through its Scheme.

147.    Moreover, because of Defendants' unlawful conduct, Outpatient Services facilities have closed or relocated to more competitive markets and would-be competitors for Outpatient Services have declined to operate in Buncombe and Madison Counties, which has decreased the quantity of Outpatient Services and increased prices paid by insurers for Outpatient Services.

---

[19] This aggregate HCA market share comes from HCA's Transylvania Regional Hospital's 44.8% market share in the zip code and HCA's Mission Hospital-Asheville's 40.5% market share in the same zip code.

[20] This aggregate HCA market share comes from HCA's Highland-Cashiers Hospital's 43.8% market share in the zip code and HCA's Mission Hospital-Asheville's 48.7% market share in the same zip code.

## IX. THE ANTICOMETITVE EFFECT OF DEFENDANTS' SCHEME: ARTIFICIALLY INFLATED PRICES, REDUCED OUTPUT, DECLINING QUALITY

148. Defendants' Scheme has caused supracompetitive prices, artificially reduced output, and reduced quality of health care by, among other things: (1) protecting Defendants' monopoly power and enabling Defendants in each Relevant Market to raise prices, reduce output, and reduce quality of GAC Services and Outpatient Services substantially beyond what would be tolerated in a competitive market, to the detriment of consumer welfare; (2) restricting the ability of health plans to use reasonable cost control methods, or otherwise induce competition between providers, including through the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for GAC Services and Outpatient Services; and (3) reducing the ability of health plans to incentivize consumers to use more cost-effective and higher quality providers of GAC Services and Outpatient Services in the Relevant Markets.

### A. Defendants Have Used the Scheme to Inflate Prices Above Competitive Levels in Each of the Relevant Markets

149. As alleged above, Defendants' Scheme has allowed them to harm competition and, thus, to raise prices above the competitive level in each of the Relevant Markets, including in the GAC Market in the Asheville Region.

150. One indication that Defendants' Scheme has artificially and anticompetitively inflated prices is that HCA/Mission prices for routine "plausibly undifferentiated" or standardized GAC and Outpatient Services have increased at a faster rate than the prices for those services statewide over the past five years.

151. A recent RAND analysis of nationwide hospital pricing data, which compared the prices negotiated between hospitals and health plans to the fee schedule set by Medicare, shows

how HCA has been able to raise prices continually well above the typical prices for routine services and procedures in the Relevant Markets.

152. Medicare prices act as a relative baseline (given the federal government's regulatory and buying power). RAND's most recent analysis reports price data at the hospital systemwide level, averaged over the 2018-2020 period, without revealing the prices charged for specific procedures. According to RAND data, Mission Hospital-Asheville, where Defendants have monopoly power, charged commercial insurers 305% above the Medicare price, on average, for GAC Services, versus the North Carolina average of 211% above Medicare. For Outpatient Services, Mission Hospital-Asheville prices are 343% above Medicare prices, on average, versus 331% for the North Carolina average. The substantially higher prices for GAC and Outpatient Services at Mission Hospital-Asheville compared to those charged by hospitals elsewhere in North Carolina are due in large part to the Scheme alleged herein.

153. HCA itself stated in recent regulatory filings in Florida that, in a county with a hospital system with monopoly power, insurers have "limited ability" to "negotiate market-driven rates for hospital services" and that, "[a] large and growing body of literature suggests that health care providers with significant market power can (and do) negotiate higher-than-competitive payment rates."[21]

154. The pricing data for specific standardized medical procedures from a large private, commercial database of health price and claims information (the "Commercial Database") are consistent with the systemwide RAND results, and further demonstrate that the alleged anticompetitive conduct has caused artificially inflated prices. The examples below are

---

[21] See HCA Certificate of Need Application.

representative of artificial price inflation on a broad array of medical procedures caused by Defendants' Scheme.

155. For example, based on a study involving the Commercial Database, Mission/HCA's average price to health plans for C-sections without complications at the Mission Hospital-Asheville ($10,076 in 2020) was more than double the statewide average ($4,373 in 2020). Further, prices for this procedure over the 2017-2020 period grew faster at Mission Hospital-Asheville than in the rest of the state (17.3 percent vs. 14.4 percent).

156. Similar patterns exist for the prices of other procedures for which data are available. While the average price for cardiovascular stress tests declined statewide between 2017 and 2020 by 10 percent, it increased by 29 percent at Mission Hospital-Asheville during this period. Moreover, the average allowed price for this procedure at HCA was roughly double that of the average allowed price in the rest of North Carolina in 2020.

157. For a shoulder arthroscopy, the price increase at the Mission-Asheville Hospital over the 2017-2020 period was 75 versus 19 percent statewide. In 2020, the Mission-Asheville price for this procedure was $2,419—nearly three times the statewide average of $897.

158. Even low-cost but high-volume procedures like a lipid panel have seen significant price increases since 2017. Mission's average allowed amount for lipid panels increased by approximately 31 percent, while the average price in the rest of the state *declined* by 19 percent.

**B.     HCA's Scheme Has Led to Artificially Inflated Prices in the Outlying Region**

159. HCA's Scheme has enabled it to inflate prices in the Outlying Region substantially above competitive levels—for example, prices at Mission Hospital-McDowell, located about 45 minutes driving time to the east of Asheville, are substantially above competitive levels due to the Scheme.

160. A rival hospital, Carolinas HealthCare System Blue Ridge Morganton, is located fewer than 30 minutes away to the east of Mission Hospital-McDowell. Mission Hospital-McDowell and Carolinas HealthCare System Blue Ridge Morganton are potential competitors.

161. Price data available in the Commercial Database for Mission Hospital-McDowell reflect that for a variety of procedures where there is a significant volume of those procedures for each year, such as, e.g., CT scans, Mission Hospital-McDowell is not only consistently one of the most expensive in the State, but it charges more than three times the average cost for such routine procedures. Mission Hospital-McDowell could not maintain such price disparities unless it had monopoly power through the Scheme.

162. For example, available price data reflect that the average allowed amount for a CT scan of the abdomen and pelvis is about $2,000 at Mission Hospital-McDowell, whereas the average in the State is just under $500. This divergence in price cannot be explained by a quality difference because CT scans are standard commodified procedures. Instead, the price differences are due to Defendants' Scheme.

163. When the COPA was in effect, Mission Hospital-McDowell pricing was well below the State average with respect to prices for Outpatient Services. Today, Mission Hospital-McDowell charges approximately 50% above the State average for Outpatient Services—corresponding with the period in which HCA/Mission were free to couple their anticompetitive contracting practices with unregulated price increases. Using an overall analysis of Outpatient Services pricing, from 2017 to 2020, Mission Hospital-McDowell's overall prices for Outpatient Services increased substantially relative to other providers in North Carolina and are now in the top 3% of prices of providers of Outpatient Services in North Carolina.

164.     Mission Hospital-McDowell is not only significantly more expensive than the State average for Outpatient Services, it is also significantly more costly than its only potentially significant competitor, Carolinas HealthCare System Blue Ridge Morganton, which is less than a 30-minute drive away. Health plans do not consider either hospital to be of significantly higher quality than the other, particularly for "plausibly undifferentiated procedures" such as a CT scan.

**C.     Defendants' Unlawful Scheme Has Reduced Output and Quality of Care**

165.     In addition to using its unlawful conduct to increase prices above competitive levels, Defendants' Scheme has reduced output and quality in each of the Relevant Markets.

166.     As a result of the Scheme, there are fewer doctors and less of the needed health care services than there would have been absent the Scheme. HCA's bolstered monopoly power is reflected in, among other things, its failure to adhere to various quality commitments included in its APA with Mission.

167.     Under Section 7.13(j) of the APA, Defendants had asserted they had "no present intent to discontinue any of the community activities, programs or services provided" prior to the buyout. Less than a year later, in October 2019, however, HCA closed outpatient rehabilitation clinics in Candler and Asheville. In 2020, it closed primary care practices in Candler and Biltmore Park and ended chemotherapy services at Mission Medical Oncology locations in Brevard, Franklin, Marion, and Spruce Pine.

168.     Section 7.13(a) and Schedule 7.13of the Amended APA require HCA to provide until January 2029 numerous defined services at Mission Hospital-Asheville. However, contrary to its obligations under the APA, HCA has reduced budgets and staffing, making it more difficult for medical staff to provide the same quality of service as before.

169.     Section 7.13(b) and Schedule 7.13(b) of the APA required HCA to provide until January 2029 numerous services at its five smaller regional hospitals. However, contrary to its obligations under the APA, HCA has cut budgets, staffing and quality there too.

170.     HCA's reductions in services are the product of its deliberate effort to reduce or drive out medical personnel. As of March 2021, at least 79 doctors had left or planned to leave the system since HCA's takeover. Other doctors describe new employment contracts with HCA in which the compensation equations remove quality of care metrics and focus almost entirely on the number of patients seen and amount billed. A significant number of patients have lost their preferred family doctors either due to doctors leaving the system or from HCA's clinic restructurings and closures.

171.     Similarly, nurses working at HCA have described their units as "inhumanely understaffed," with conditions so bad that even travel nurses hired to fill in gaps were leaving before their contracts expired. Patients and families describe situations where, for example, their nurse admitted that "she cries every single night because she knows she is not giving appropriate, competent patient care."

172.     HCA's cutbacks in service, driven by its exploitation of the additional monopoly power it has gained through the Scheme, have been criticized by regulators. Among other things, the North Carolina Attorney General stated in February 2020 that the Defendants' "decision to focus on emergent care appears inconsistent with the Asset Purchase Agreement" and that the Defendants' website incorrectly claimed its charity care policy covered "non-elective" services. The Attorney General's office also said it had received a "surge" of complaints, including "harrowing" complaints about quality of care and staffing cuts.

173.    If Defendants were operating in a competitive market for all of their services in the Relevant Markets, they would not have been able to take these anticompetitive actions. However, due to the Scheme alleged herein, health plans and patients have no choice but to endure the rising prices and worsening quality of service.

174.    In a March 16, 2022 letter from North Carolina's Assistant Attorney General Llogan Walters to Greg Lowe, president of HCA Healthcare's North Carolina division, the North Carolina Department of Justice highlighted earlier complaints about primary care and OB/GYN physicians leaving Mission facilities, reduced nursing and administrative staff in emergency departments, a reduction in core services, and higher prices.[22]

175.    Since then, the North Carolina Department of Justice has received additional complaints that Mission's Transylvania County Regional Hospital (which HCA acquired as part of the 2019 Mission transaction) had no mammogram technician and was offering no mammogram services at all; that Mission hospital mental health facilities are inadequately staffed; that ENT cancer treatment practices have left Mission Health; and that because of understaffing, HCA's health facilities were unclean and that patients are experiencing long wait times. The letter noted that while HCA justified these outcomes because of pandemic-related labor shortages, other medical establishments elsewhere in the State facing the same labor market conditions, did not have the same high numbers of complaints.

176.    Other officials, including representatives of Plaintiffs such as the Mayor of Asheville and Buncombe County officials, have also publicly expressed "deep concerns" about HCA's dramatic cuts and the pressure put on doctors and nurses. Doctors, nurses, and patients have also called the situation created by HCA's cost cutting "dangerous," and have noted that

---

[22] https://www.scribd.com/document/567469487/NC-DOJ-Letter-to-HCA-16-March-2022.

HCA's policies force doctors and nurses to see more patients to maximize profit at the expense of patient care.

177.    On February 10, 2020, the Chairman of the Buncombe County Commissioners Brownie Newman, Asheville Mayor Esther Manheimer, and most of the delegation of Buncombe County's elected officials in the North Carolina statehouse lambasted these conditions, finding that "numerous, aggressive staff cuts over the past year, put[] patient safety at risk" and that "HCA has aggressively pursued contract renegotiations with multiple physician practices, resulting in unfortunate outcomes."

178.    Due to the Scheme, leading national agencies that assess quality of care factors such as safety, accidents, injuries, infections, and readmissions lowered their ratings for the Defendants' hospital system. The Leapfrog Group, an independent agency, downgraded Mission Hospital-Asheville to a "B" from an "A." According to Leapfrog, the hospital fell short in various measures, including infections, high-risk baby deliveries, some cancer treatment procedures, and the patient experience regarding elective surgeries.

179.    The Centers for Medicare & Medicaid Services ("CMS") also downgraded Mission. CMS uses surveys of patients' experiences, including how responsive hospital staff were to their needs and the cleanliness of the hospital environment. In 2020, CMS even threatened to terminate its contract with HCA/Mission over patient safety concerns, a rare and particularly serious step.

180.    CMS's most recent ratings graded the Mission-Asheville hospital two out of a possible five stars, compared to four stars at both AdventHealth Hendersonville (formerly Park Ridge Health) and Pardee UNC Health Care in Hendersonville

181.     Between August 2018 and January 2019, the Attorney General of North Carolina required Mission and HCA to include certain provisions in the APA to secure his approval. Under these provisions, Defendants promised to uphold certain commitments set forth in the Amended APA.

182.     Certain of these commitments have been the subject of multiple public complaints, providing additional evidence of the dramatic reduction in necessary medical care provided by HCA in the Relevant Markets.

183.     HCA promised that until January 2029 it would maintain the same level of charity care coverage for poor patients as it had previously. However, contrary to its promises, HCA has (a) reduced coverage for non-emergency services, (b) implemented a threshold such that out-of-pocket expenses must exceed $1,500 to qualify for charity care coverage, and (c) ended pre-approval for charity care coverage such that patients are forced to risk taking on substantial debt or forgo needed care.

184.     Due to the Scheme, the Mission Health System now controlled by HCA has rapidly declined, going from one of the most respected hospitals in the nation and a "crown jewel" of North Carolina's health care system to facilities with deteriorating, even dangerous conditions. At the same time, HCA's profits are at an all-time high, driven by the new addition of Mission Hospital-Asheville as the HCA chain's second highest revenue generating hospital out of all 100-plus in the chain.[23] HCA's revenues from Mission Hospital-Asheville were recently reported to be over $1.2 billion, ahead of all but one of the other 100-plus hospitals in the HCA chain and second only to HCA's Methodist Hospital (Texas) which has over twice as many beds.

---

[23] Top 50 HCA Hospitals by Net Patient Revenue, https://www.definitivehc.com/blog/top-hca-hospitals-nationwide (reflecting that Mission Hospital-Asheville has the second-highest revenues of all of the HCA hospitals, at $1,209,452,518).

185.    In a competitive market, insurers contracting with a hospital can discipline such pricing behavior by threatening in their negotiations, *inter alia*, to take the hospital out of network and to purchase services from a competitor and/or to steer patients to less expensive or higher quality alternatives. But because of Defendants' monopoly power and Scheme to maintain and enhance it, insurance plans are forced to pay artificially inflated prices and endure substandard care.

186.    Defendants' Scheme has no procompetitive benefits at all, let alone benefits that could outweigh the foregoing substantial anticompetitive effects.

## X.    DEFENDANTS' SCHEME HAS CAUSED ANTITRUST INJURY AND DAMAGES TO PLAINTIFFS AND THE CLASS

187.    Defendants' Scheme has caused antitrust injury to Plaintiffs and the proposed Class by artificially inflating prices they have paid for GAC and Outpatient Services directly to Defendants in the Relevant Geographic Markets. The alleged unlawful conduct, and Plaintiffs' injuries, are continuing through the present.

188.    Plaintiffs' injuries are of the type that the antitrust laws were intended to prevent and flow from that which makes Defendants' acts unlawful under the antitrust laws.

189.    More specifically, Plaintiffs' injuries flow from the Scheme, which violates Sections 1 and 2 of the Sherman Act.

## XI.    CLASS ALLEGATIONS

190.    Plaintiffs bring this action on behalf of themselves and as representatives of a Class of similarly situated entities defined as follows:

> All insurers and health plans that paid for GAC Services and/or Outpatient Services in the Asheville Region and/or the Outlying Region directly from one or more Defendants at any time during the period from June 3, 2018 up to the time the alleged ongoing anticompetitive conduct has ceased (the "Class Period"). The Class excludes all federal governmental entities.

191. This class definition is subject to revision or amendment as the matter proceeds.

192. This action is suitable for resolution on a class-wide basis under the requirements of Fed. R. Civ. P. 23.

193. The Class is composed of at least hundreds of members, the joinder of whom in one action is impractical. The Class is ascertainable and identifiable from, inter alia, Defendants' records and documents.

194. Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common issues include, but are not limited to:

a. Whether Defendants have monopoly power demonstrated either through direct or indirect evidence;

b. The definition of the relevant services and geographic markets;

c. Whether Defendants engaged in anticompetitive conduct by willfully or otherwise unlawfully maintaining or enhancing their monopoly power or attempting to do so through the Scheme alleged herein;

d. Whether Defendants' abuse of their monopoly power has substantially foreclosed competition in the Relevant Markets;

e. Whether Defendants' Scheme, or any part thereof, is an unlawful restraint of trade;

f. Whether the Scheme has artificially inflated prices, reduced output, and/or reduced quality in any or all of the Relevant Markets;

g. Whether Plaintiffs and the proposed Class have suffered injury caused by the alleged anticompetitive conduct; and

h. Whether and to what extent Plaintiffs and the proposed Class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

195. Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the other Class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

196. Plaintiffs will fully and adequately assert and protect the interests of the other Class members. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases. Neither Plaintiffs nor their attorneys have any interests conflicting with Class members' interests.

197. This class action is appropriate for certification because questions of law and/or fact common to the members of the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

198. The prosecution of the claims of the Class in part for injunctive relief, declaratory, or equitable relief, is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

# XII.    CLAIMS FOR RELIEF

## COUNT ONE

### UNLAWFUL MONOPOLIZATION IN VIOLATION OF
### SECTION 2 OF THE SHERMAN ANTITRUST ACT

199.    The above-alleged paragraphs 1 through 198 are incorporated by reference.

200.    Defendants have monopolized, and continue to monopolize, the Relevant Services and Geographic Markets alleged herein in violation of Section 2 of the Sherman Act.

201.    At all relevant times, including the last four years, Defendants possessed monopoly power in each of the Relevant Markets. Defendants' monopoly power was durable rather than fleeting and included the ability to raise prices profitability above those that would be charged in a competitive market.

202.    Defendants unlawfully maintained and/or enhanced the monopoly power through the Scheme alleged herein.

203.    Through the Scheme, Defendants were able to charge supracompetitive prices and reduce output in the Relevant Markets.

204.    The Scheme caused injury to Plaintiffs and the proposed Class by causing them to pay supracompetitive prices. Plaintiffs and the proposed Class seek to recover for these injuries.

## COUNT TWO

### RESTRAINT OF TRADE IN VIOLATION OF
### SECTION 1 OF THE SHERMAN ANTITRUST ACT

205.    The above-alleged paragraphs 1 through 204 are incorporated by reference.

206.    Through the Scheme alleged herein, Defendants have entered into agreements with health plans that unreasonably restrained trade in each of the Relevant Markets, in violation of Section 1 of the Sherman Act.

207. Defendants possessed market power in each of the Relevant Markets.

208. Defendants' contractual Scheme restrained competition by imposing all-or-nothing contracting, by prohibiting steering and tiered networks, and by preventing the disclosure of price information.

209. There are no pro-competitive justifications for the Scheme.

210. Through the Scheme, Defendants were able to charge supracompetitive prices and reduce output and quality in the Relevant Markets.

211. The Scheme caused injury to Plaintiffs and the proposed Class by causing them to pay supracompetitive prices. Plaintiffs and the proposed Class seek to recover for these injuries.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims so justiciable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the proposed Class and adjudge and decree as follows:

A. certifying the proposed Class, designating the named Plaintiffs as class representatives and the undersigned counsel as class counsel, and allowing the Plaintiffs and the Class to have trial by jury;

B. finding that Defendants have monopolized, and continue to monopolize, the Relevant Markets alleged herein in violation of Section 2 of the Sherman Act, and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

C. finding that Defendants have unlawfully restrained trade in the Relevant Markets alleged herein in violation of Section 1 of the Sherman Act and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

D. ordering that Plaintiffs and members of the proposed Class recover threefold the damages determined to have been sustained by them as a result of Defendants'

misconduct complained of herein, and that judgment be entered against Defendants for the amount so determined;

E.     awarding reasonable attorneys' fees, costs, expenses, prejudgment and post-judgment interest, to the extent allowable by law;

F.     awarding equitable, injunctive, and declaratory relief, including but not limited to declaring Defendants' misconduct unlawful and enjoining Defendants, their officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on their behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged hereinabove; and

G.     awarding such other and further relief as the Court may deem just and proper.

Dated: July 27, 2022.

/s/ Robert N. Hunter, Jr.
Robert N. Hunter, Jr.
Fred Berry
John F. Bloss
HIGGINS BENJAMIN, PLLC
301 North Elm Street, Suite 800
Greensboro, NC 27401
Phone: (336) 273-1600
Facsimile: (336) 274-4650
rnhunter@greensborolaw.com
fberry@greesnborolaw.com
jbloss@greensborolaw.com

Eric L. Cramer*
Jacob M. Polakoff*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
jpolakoff@bm.net

Robert E. Litan*
Daniel J. Walker*
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net

dwalker@bm.net

Brendan P. Glackin*
Dean M. Harvey*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Phone: (415) 956-1000
bglackin@lchb.com
dharvey@lchb.com

Daniel E. Seltz*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
dseltz@lchb.com

*Counsel for Plaintiffs and the Proposed Class*

*Applications for admission *pro hac vice* forthcoming